Filed 4/30/15  P. v. Torres CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065126 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD243940) |
| MIGUEL ANGEL TORRES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth Kai-Young So, Judge.  Affirmed in part as modified, reversed in part, and remanded with directions.

Law Office of Kurt David Hermansen and Kurt David Hermansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

The San Diego County District Attorney filed an information charging Miguel Angel Torres with four counts of committing a lewd and lascivious act upon his stepdaughter (the victim), a child under the age of 14 years (Pen. Code, § 288, subd. (a), hereafter Pen. Code, § 288(a)), and alleging that Torres committed each offense between January 1, 2011 and October 16, 2012. Specifically, in counts 1 and 2 the information alleged that he touched the victim's legs two times during that time period: a "first time" (count 1) and a "last time" (count 2). In counts 3 and 4 the information alleged that Torres touched the victim's stomach two times during that period: a "first time" (count 3) and a "last time" (count 4). Thus, counts 1 and 3 were the "first-time" counts, and counts 2 and 4 were the "last-time" counts.

As to each of the four counts, the information alleged that Torres was previously convicted of Penal Code section 288(a) within the meaning of Penal Code section 667.61, subdivisions (a), (c) and (d) (which, under subdivision (a), would increase the punishment for each count to a state prison term of 25 years to life).

The information also contained additional sentence enhancement allegations that in May 2002 Torres had suffered six prior convictions for committing a lewd and lascivious act upon a child under the age of 14 years (specifically, his other two stepdaughters from a prior marriage, V.R. (V.), and G.R. (G.), as discussed, *post*), each of which qualified as both (1) a prior serious felony conviction (within the meaning of Pen. Code, §§ 667, subd. (a)(1), 1192.7, subd. (c)), and (2) a prior strike conviction within the meaning of the Three Strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, 668). The

parties stipulated that Torres had committed three of the prior lewd and lascivious acts against V. and the other three lewd and lascivious acts against G.

At trial the court admitted, under Evidence Code[1] sections 1108 and 352, propensity evidence of Torres's prior sexual molestations of both V. and G. A jury found Torres guilty of all four current Penal Code section 288(a) counts, and Torres admitted that all of the prior serious felony and strike conviction allegations were true.

The court sentenced Torres to an aggregate state prison term of 300 years to life plus 20 years, consisting of four consecutive indeterminate terms of 75 years to life (25 years to life under Pen. Code, § 667.61, subd. (a), tripled under the Three Strikes law), plus a consecutive determinate term of 20 years (five years on each count under Pen. Code, § 667, subd. (a)(1)).

*Contentions and holdings*

Torres raises seven contentions on appeal. First, he contends all four of his convictions should be reversed and the case remanded for a new trial because the court abused its discretion under sections 1108 and 352, and violated his federal constitutional right to due process by admitting into evidence "irrelevant and highly inflammatory details" of his prior sexual molestations of his stepdaughters from his prior marriage, V. and G.

Second, Torres contends that, "if this [c]ourt determines that the trial court did not abuse its discretion by admitting the prior-sex-offense evidence without limitation," his

---

[1]    All further statutory references are to the Evidence Code unless otherwise specified.

3

convictions should be reversed and the matter remanded for retrial because his trial counsel provided ineffective assistance by failing to make "fact-specific objections" to exclude irrelevant and "highly inflammatory details" of his prior sexual molestations of V. and G.

Third, he contends his convictions should be reversed and the matter remanded for retrial because his trial counsel provided ineffective assistance—after the panel of prospective jurors was informed of Torres's prior sexual offenses—by failing to move for a mistrial after a prospective juror allegedly "tainted the entire jury venire panel with bias."

Fourth, Torres claims two of his four convictions—either counts 2 and 4 (the last-time counts) or (as the Attorney General suggests) counts 1 and 3 (the first-time counts)—should be reversed because the court lowered the prosecution's burden of proof and violated his federal Constitutional right to due process when it erroneously responded to the first of two questions in jury note No. 3 by answering "Yes" to the question of whether, if the jury were to agree that "one instance" happened, "[that would] also be both a 'first time' and 'last time.' " As noted, the Attorney General concedes that two of Torres's four convictions—specifically, counts 1 and 3—should be reversed because "the trial court's response could have led the jurors to find [Torres] guilty of four counts even if the jurors only agreed that he was guilty of two criminal acts."

Fifth, in a related claim Torres contends all four of his convictions should be reversed and the case remanded for retrial because the court erroneously instructed the jury in its response to the second question in jury note No. 3 that the jurors could consider

4

"all the evidence," including evidence of alleged acts that occurred before the time period charged in the information. In response the Attorney General again concedes that Torres's convictions of counts 1 and 3 (the first-time counts) should be reversed "due to the trial court's flawed response" to jury note No. 3, but argues his convictions of counts 2 and 4 (the last-time counts) should be affirmed because the court "properly instructed the jury on the date range of [those] charged offenses" and "there is no possibility that the jury could have convicted [Torres] on [those counts] based upon anything that happened" before the time period charged in the information.

Sixth, Torres contends that, if this court determines that he forfeited either of his two preceding claims of error—which are based on the trial court's responses to jury note No. 3—by failing to state a proper objection, all four of his convictions should be reversed and the case remanded for retrial because he "was denied his Sixth Amendment right to effective assistance of counsel when defense counsel failed to object to the trial court's instructions that (1) one act would be both a 'first time' and a 'last time,' and (2) the jury could consider acts that occurred outside the charged time period."

Last, Torres contends that all four of his convictions should be reversed and the case remanded for retrial because the "cumulative effect" of the court's "multiple errors" deprived him of his federal and state constitutional due process right to a fair trial.

For reasons we shall explain, we reverse Torres's convictions of counts 1 and 3 and affirm his convictions of counts 2 and 4. We further modify the judgment by reducing Torres's aggregate prison sentence to an indeterminate term of 150 years to life plus 10 years, consisting of two consecutive indeterminate terms of 75 years to life (25

5

years to life under § 667.61, subd. (a), tripled under the Three Strikes law) for his convictions of counts 2 and 4, plus a consecutive determinate term of 10 years (five years on each count under § 667, subd. (a)(1)).  We remand the matter to the superior court with directions to correct the abstract of judgment.

FACTUAL BACKGROUND

A. *The People's Case*

The victim is the daughter of Janet G. (mother) and Carlos C., Sr. (father).  She was 12 years old at the time of trial in late 2013.  Mother and father had four children together (from oldest to youngest):  (1) G.C. (the older of the victim's two brothers), (2) K.C. (the victim's sister), (3) C.C., Jr. (the younger of the victim's two brothers), and (4) the victim.  Mother and father separated in 2004.

Mother met Torres in 2006.  She testified that Torres told her about a month after she met him that he was a registered sex offender.  He informed her he had been convicted of an offense involving his two stepdaughters.

Mother and Torres began dating a few months later.  In around 2007, about a year and a few months after he met mother in 2006, Torres moved in with her and her four children in a house in Lakeside where they were living.  About one and a half years later they moved into an apartment on Home Avenue.  In 2010 they moved again to a residence on Craigie Street.  Torres and mother married in 2011.  During their relationship Torres and mother had a child of their own, M.

6

*The Lakeside house*

The victim and one of her two brothers—C.C., Jr.—shared one of three bedrooms in the Lakeside house. The victim testified they had bunk beds in that bedroom and they would "switch it around" as to who would have the top bunk and who would have the bottom one. The victim and C.C., Jr. sometimes left their bedroom door open when they slept.

The victim testified that when she was about seven or eight years old, Torres began touching her while she was asleep in her bedroom in the Lakeside house. Torres would touch her upper thigh, his hand moving in a circular fashion. She also felt his hands on her stomach, from her waist to her lower chest. When asked whether Torres touched her vaginal area, the victim answered, "Somewhat." The prosecution asked her to describe how close Torres's hand came to her vagina "on a scale of 1 to 10, 10 being on [her] vagina." She replied, "Seven." She did nothing when she felt Torres rubbing her body because she was "scared" of him.

The victim also testified that Torres would come into her room and rub her body about two times per week when she and the family lived in Lakeside. She indicated he would do it early in the morning close to the time she had to get up to go to school. Torres worked early in the morning.

The victim testified she felt "disgusted" when Torres rubbed her legs and body. She indicated this touching was "different." When Torres came in to the room just to wake her up, he would turn on the light and would not touch her; the light would wake

7

her up.  Sometimes she would try to stop his touching her by "pushing him away."  When she did this, he never said anything, like "I was just trying to wake you up."

*The Home Avenue apartment*

The Home Avenue apartment had two bedrooms.  The victim and her sister—K.C.—shared a bedroom and slept in the same bed, and C.C., Jr. slept on the couch.

The victim testified that Torres's touching her happened "once in a while," about twice a month, in the same way in her bedroom at the Home Avenue apartment.  She testified that K.C. was never in bed when Torres came into the room and touched her.  She did not know where K.C. was during those times.

While the family lived in the Home Avenue apartment, the victim learned that Torres was a registered sex offender.  She and a couple of her friends searched for registered sex offenders in their area using an "iPod" application.  They learned that Torres had been convicted of a crime involving children under the age of 14 years.  When the victim spoke with her mother about it, her mother said it was not true.

*The Craigie Street residence*

The Craigie Street house had three bedrooms, and the victim and C.C., Jr. initially shared one of them.  They had separate beds, about three feet apart.  K.C. moved out of the house in the fall of 2012 to attend college in Berkeley, and the victim then had her own room, but only for a two-week period.

During the time the family lived at the Craigie Street address, Torres worked for a trucking delivery company.  He would wake up between 4:00 and 5:00 a.m. and start

8

work at 5:00 or 6:00 a.m. Mother would wake up the children at 6:20 a.m., after Torres left for work, to get them ready for school.

The lock on the victim and C.C., Jr.'s bedroom door broke. The victim testified that in order to keep the door closed at night, she and her brother placed a towel or piece of cloth in the door jamb. She testified that to open the bedroom door, someone would need to push on the door, which made a creaking noise that was loud "enough so somebody could hear it."

The victim testified that Torres's touching her continued at the Craigie Street house both before and after the lock broke. The touchings happened in the same way and increased in frequency to about three times per week.

*The victim's disclosures to her friends*

The victim testified she did not tell anyone about the touching when they lived in Lakeside or on Home Avenue because she was scared she would be taken away from her family.

In early October 2012, when she was 11, the victim told three friends at her middle school about the touchings: Van, Jasmin, and Carolina. She first disclosed the touchings to Van and Carolina in private Facebook messages. Van and Carolina then told Jasmin. The victim testified she then chatted with all three friends on Facebook about what Torres was doing to her. While chatting with them she would cut herself on the arm with a razor blade and show them pictures of herself cutting her arm.

The victim testified she cut her arm because she "felt so worthless." She would ask herself, "What did I do wrong?" She described holding the blade and "slid[ing] it

9

against [her] skin." She also told her friends that she wanted to die and that she had tried to kill herself. Jasmin testified that the victim told her she was afraid of her stepdad (Torres) because he might "hurt her again."

The victim further testified that she and her family took a weekend trip to visit K.C. in San Francisco. She testified that during the trip, Van, Jasmin, and Carolina urged her through Facebook to tell the school counselor, Sergio Hernandez, about the touching.

Carolina, who was 12 years of age at the time of the trial, testified she was the victim's friend and classmate. In October 2012 the victim told her that her stepfather had been touching her "in a bad way." The victim also told her she was cutting her wrists and wanted to die. Carolina testified she told the victim to tell her mother about what was happening to her. The victim told Carolina she was "scared" of Torres.

Jasmin, who also was 12 years of age at the time of the trial, testified that the victim told her in October 2012 that her stepfather (Torres) "sexually harassed" her and she was afraid of him. Jasmin also testified that the victim said "she was afraid that he was going to hurt her again." The victim told Jasmin she wanted to die because her life was "messed up already." The victim sent her pictures on Facebook showing the victim cutting her arm. Jasmin testified she told the victim to talk to the school counselor.

Van, who also was 12 years of age at the time of the trial, testified that the victim told her in October 2012 about the victim's stepfather touching her. Van testified she convinced the victim to tell the school counselor about what was happening to her.

*The victim's disclosures on October 16, 2012, to the school counselor and the school police*

On Tuesday, October 16, 2012, the day the victim returned to school, Van took her from their physical education class to the office of the school counselor, Hernandez. The victim talked to Hernandez about what Torres was doing to her, and Hernandez contacted the school's police officer, Officer Carla Kuamoo.

Hernandez testified that the victim appeared "emotionally upset" and "maybe a little bit embarrassed." The victim told him, "I feel like somebody is touching my body at night, my legs, my body." She said she knew her bedroom door had been opened because a towel she put between the door and door frame would be on the floor in the morning. The victim identified her stepdad as the person who was touching her. The victim told Hernandez, "My stepdad is a registered sex offender." Soon thereafter Hernandez ended the interview and arranged to have Officer Kuamoo come immediately to his office.

While the victim waited outside his office, Hernandez briefed Officer Kuamoo about what he had learned. Officer Kuamoo then walked with the victim to Officer Kuamoo's office. Officer Kuamoo testified that the victim was "very quiet and appeared sad." The victim told Officer Kuamoo that Torres, her stepfather, was touching her all over her body in the nighttime and that it had been happening since she was nine years old. The victim said that she had only told three female sixth grade students at the school before talking with Hernandez.

11

Officer Kuamoo testified the victim told her she decided to tell Hernandez about the touchings because she "couldn't take it anymore." The victim said she put a towel in the door jamb of her bedroom door every night to try to secure the door because it did not have a lock. She told Officer Kuamoo she would find the towel on the floor in the morning. The victim indicated she sometimes saw Torres come into her room, and he would "speed walk" out of the room if he realized she was awake.

Officer Kuamoo also testified the victim told her Torres last touched her "[a]bout one week ago," and she found out that Torres was a registered sex offender because she looked him up on the registered sex offender Internet website.

*Detective Dickinson's October 16, 2012 recorded interview of the victim, and the victim's recantation letter*

Later that same day, San Diego Police Department Detective Steven Dickinson interviewed the victim in Hernandez's office. The audio recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview, the victim, who was then 11 years old, told Detective Dickinson that Torres had been touching her. She said Torres thought she did not know about the touching and "he [thought] he [could] get away with it." She told Detective Dickinson that the last time it happened was about a week earlier when Torres walked into her room and touched her leg while she was sleeping. She said he "stood up and just got out" when she moved her leg. The victim also said Torres would touch her on her thighs, and he would touch her breasts under her pajamas. He had been touching her there about three times a week for about two years. When Detective Dickinson asked her

12

how she knew it was Torres who was touching her, the victim replied, "Cause I woke up and I saw him."

Detective Dickinson scheduled a forensic interview at Rady Children's Hospital for the following day.

The victim testified she was scared to go home after she was interviewed because she knew her mother would not believe her. Her mother came to pick her up from school, and Torres, M., and C.C., Jr. were with her mother in the car. When the car circled the campus a few times and then appeared to be leaving, police officers stopped the vehicle and detained Torres.

A female police officer spoke to mother before letting her take the victim home. When mother was told about the allegations against Torres, she appeared to be upset and denied that anything had happened. The officer informed the mother about the forensic interview of the victim scheduled for the next day and instructed mother not to talk to the victim about the allegations.

The victim testified that mother drove her home. On the way, mother stopped at a store, where she met the victim's two aunts. The victim testified her mother yelled at her and said she lied about the touching. Mother and the victim's aunts told her the touchings were just dreams.

The victim also testified that, when they got home, mother angrily told her that everything that happened was her fault, and it was "only nightmares." Mother told the victim to tell the authorities she was just having nightmares, so that Torres could come home. That night, while mother was watching her, the victim wrote a two-page

13

recantation letter saying she had just been having nightmares.  Mother then read the letter.  The victim testified she decided to write the letter because "[she] didn't want [her] mom to be mad at [her] anymore."

*First recorded forensic interview of the victim* (*October 17, 2012*)

The next day, Wednesday, October 17, 2012—just before her forensic interview— the victim gave to Detective Dickinson at the Chadwick Center at Rady's Children's Hospital the recantation letter she had written after her mother told her that what had happened to the victim was not real and was only nightmares.

Laurie Fortin (Fortin), a forensic interviewer at the Chadwick Center, then interviewed the victim.  The audio recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview, the victim told Fortin that a couple of days earlier Torres shook her leg to wake her up because she was having nightmares.  She said she had asked the detective if she could get help from the hospital because every day she was "hav[ing] nightmares where [she] feel[s] someone breathing and someone touching [her]."  The victim told Fortin she had been having these nightmares since she was eight years old. The victim also said she did not know who was touching her in her nightmares.  She told Fortin she only saw her stepdad one time when he woke her up.  She also said she wrote the letter she had just given to Detective Dickinson "cause [she] needed help."

The victim also told Fortin that she wrote the letter "last night" when she was alone in her room.  The victim said that, before she wrote the letter, she woke up because she felt someone touch her and she ran to the bathroom and then told her mom.  Mother

14

told her it was "just [her] imagination." The victim said that "[n]othing" happened in the car the day before when mother drove her home, and she "just stayed quiet" in the car while doing her homework. She told Fortin she was living on Craigie Street, and three times a week she was having the nightmare about somebody breathing and touching her. She said these nightmares started when she was living in Lakeside, but she had them less often then.

Fortin told the victim she had spoken with Detective Dickinson, and he said the victim had told him about her stepdad touching her chest. The victim acknowledged she had "told him about that," and then told Fortin, "[B]ut like now I know it wasn't him."

*Detective Dickinson's second recorded interview of the victim* (*October 18, 2012*)

On Thursday, October 18, 2012, the day after the forensic interview at the Chadwick Center, Detective Dickinson again interviewed the victim briefly at her school in Hernandez's office. The audio recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview, Detective Dickinson told the victim he had learned she was cutting her arm and wanted to know why. The victim told him she was cutting her arm because of "[p]ressure" from "[y]ou guys." Detective Dickinson asked the victim when she cut her arm, and she replied, "Like Friday" (October 12). Detective Dickinson responded, "Okay, but you didn't know me on Friday," and added, "So I couldn't have caused [pressure]." The victim said, "I know," and then told him, "But like, now I have a lot of pressure."

15

Detective Dickinson testified that he took a photograph during the interview of the 16 cuts on the inner side of the victim's left forearm, then took her into protective custody and had her transported to the Polinsky Children's Center. The victim did not want to go there and became emotional. At the Polinsky Children's Center, Detective Dickinson tried to calm her by telling her she could still attend her same school and the social worker would try to make her routine as normal as possible. Detective Dickinson testified that the victim did not ask to live with mother. He also testified that he told the victim that he and Fortin believed "[her] first story," and the victim replied, "You and my friends are the only ones that believe me." The victim's demeanor then changed and she seemed happy. Detective Dickinson testified "she was completely different" and "she went from frowning to smiling."

*Fortin's second recorded forensic interview of the victim* (*October 23, 2012*)

Fortin conducted a second forensic interview of the victim on Tuesday, October 23, 2012. A video recording of the interview was played for the jury.

During the interview the victim said she was living at the Polinsky Children's Center. When Fortin asked her, "How is it?," she replied, "Fun." When Fortin told the victim she (the victim) was feeling bad the last time they met because her stepdad had gone to jail and her mother was upset, the victim replied, "The whole world was upset." Fortin asked whether she was still feeling bad, and the victim replied, "No," indicating that the Polinsky Children's Center had helped her to feel better.

16

The victim told Fortin that Torres began touching her when she was "like [10]." The last time he touched her was about two weeks earlier. She said he grabbed her leg and "that's when I saw him."

Fortin asked the victim to tell her about the other times Torres touched her. The victim replied, "I would be sleeping, but I'm not dumb." She added that she could "feel everything." She said she would hear the door creaking as it opened. The victim then told Fortin that, when she heard the noise, she "would just, like, open my eyes and when [Torres] saw me open my eyes, he would get out."

When Fortin asked about the touchings, the victim said she "would like act asleep" when Torres was touching her. When she opened her eyes, Torres would "disappear or something," but sometimes she would "see him walking out." Torres touched the victim's "leg muscles," and he also touched her, "in a poking manner, on her stomach."

The victim told Fortin she had told her friend Carolina that she wanted to kill herself. When Fortin asked the victim why she started cutting herself, she replied, "because whenever I thought of it, I thought, I just thought my life was ruined." Fortin asked, "Thought about what?" The victim answered, "You know, about what [Torres] was doing in the night."

*Child Sexual Abuse Accommodation Syndrome Evidence*

In addition to testifying for the prosecution as a percipient witness regarding her observations during her forensic interviews of the victim, Fortin also testified as an expert

17

witness.[2]  She testified that, in the context of child abuse, " 'recantation' is believed to be . . . a stage of a child's disclosure process for some kids, a minority of kids."  She referenced a study that found three "statistically significant predictors" of recantation among child sexual abuse victims:  (1) an offender who is "a parental figure, typically . . . a father figure, mom's boyfriend, stepfather"; (2) "a nonsupportive primary caretaker, which was the moms [*sic*] in 90 percent of the cases"; and (3) the child's age.

Fortin also testified about "delayed disclosure" in the child abuse arena.  She told the jury that "the majority of kids actually delay in disclosing abuse."  She testified that studies show children do not exhibit any particular mannerisms or behavior when they disclose sexual abuse.  She also discussed literature that suggests older children—ages 10 years "up to teens"—are more likely than younger age children to disclose abuse to their peers.  Fortin also testified that a child who has received negative feedback after disclosing abuse might recant but then "reaffirm" the initial disclosure after receiving positive feedback.

*Torres's prior sexual offenses* (*Pen. Code*, § *288(a)*)

The parties stipulated that in February 2002 Torres was charged under Penal Code section 288(a) with 26 counts of committing lewd and lascivious acts on a child under the age of 14 years between 1989 and 1999.  Those offenses involved Torres's two stepdaughters from a prior marriage, V. and G.

---

[2]    In his appellant's opening brief, Torres notes that Fortin testified as an expert witness on child sexual abuse accommodation syndrome.

18

The parties also stipulated that in May 2002 Torres pleaded guilty to committing three of those counts against V. and three of those counts against G. and that the remaining charges were dismissed.

As discussed more fully, *post*, V., G., and retired San Diego Police Department Detective James McGhee all testified about Torres's prior Penal Code section 288(a) sexual offenses against V. and G.

*The defense case*

C.C., Jr., the victim's 15-year-old brother, testified for the defense. He testified that his and the victim's older brother, G.C., did not like it when Torres moved in with them, so G.C. went to live with their father.

C.C., Jr. testified that he and the victim had shared a bedroom in the Lakeside house for five or six months. During the rest of that year the victim shared the bedroom with their sister, K.C. C.C., Jr. testified he knew Torres was a sex offender, but during the time he shared the bedroom with the victim he never saw or heard Torres enter the bedroom late at night. He never heard Torres climb into the victim's bed and molest her, and he never woke up and saw Torres running from the bedroom.

C.C., Jr. also testified that he did not share a bedroom with the victim at the Home Avenue apartment, where they lived next for about a year and a half. The victim and K.C. shared a bedroom and slept in the same queen-size bed. While they lived there, C.C., Jr. never heard Torres walking into the victim and K.C.'s bedroom late at night.

C.C., Jr. further testified that when he and his family moved to the Craigie Street address, where they lived for about a year, he shared a bedroom with the victim and they

19

each slept in one of the bunk beds. The beds were separated after two months and placed about five feet apart. He and the victim used a towel to keep the door shut. Opening the door made a thumping noise. In C.C., Jr.'s opinion, the victim had a reputation for being dishonest.

K.C., the victim's 19-year-old sister, testified that she first met Torres in around 2007 before she and her family moved to the Lakeside house. Before they moved there, mother told her that Torres was a registered sex offender.

K.C. testified that Torres never made any inappropriate comments or gestures toward her during the time they lived in Lakeside. When she and the victim shared a bedroom in the Lakeside house for about six months, they pushed their twin beds together to make more room. The victim always slept by the wall, so someone would have to climb over K.C. to get next to the victim. She never woke up in the middle of the night and noticed Torres climbing over her to get to the victim.

K.C. testified that she shared a bedroom with the victim at the Home Avenue apartment, and they slept in the same queen-size bed in a corner of the room. The victim slept against the wall. She never noticed Torres come into the bedroom in the middle of the night, climb into the bed, and start rubbing and touching her sister. She never woke and noticed Torres in the bedroom.

K.C. also testified she had her own bedroom when they moved to the Craigie Street address. She never heard a thump in the victim and C.C., Jr.'s room. In her opinion, the victim had a reputation for being dishonest.

20

The father of G.C., K.C., C.C., Jr. and the victim also testified for the defense.  In his opinion, the victim had a reputation for being dishonest.

DISCUSSION

I. *ADMISSION OF EVIDENCE OF TORRES'S PRIOR SEXUAL OFFENSES* (§§ *1108, 352*)

Torres first contends all four of his convictions should be reversed, and the case should be remanded for a new trial, because the court abused its discretion under sections 1108 and 352, and violated his federal Constitutional right to due process, by admitting into evidence "irrelevant and highly inflammatory details" of his prior sexual molestations of his stepdaughters from his prior marriage.  We conclude the court did not abuse its discretion and did not commit constitutional error.

A. *Background*

1. *In limine proceedings*

The prosecution filed a trial brief setting forth the facts underlying Torres's prior Penal Code section 288(a) convictions for the sexual offenses he committed against V. and G., as well as the facts it intended to prove regarding the current charged offenses against the victim.  The prosecution also filed a motion to admit evidence of her disclosures to her friends, school counselor, law enforcement officers, and the forensic interviewer at the Chadwick Center.  Citing *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) (discussed, *post*), Torres filed a motion in limine to exclude under section 352 the evidence of his prior sexual offenses.

21

At the hearing on the motions, defense counsel acknowledged that the court "ha[d] latitude" in admitting the evidence under section 1108 and urged the court to exclude the evidence of the prior sexual offenses after conducting an analysis under section 352. Torres's counsel stated: "I think the two convictions in his prior case are extremely prejudicial. And my fear is that, if the jury hears these two witnesses [(V. and G.)] testify as to what happened . . . between 1992 and 1997, I believe . . . it's going to definitely evoke an emotional bias with the jury."

Defense counsel also asserted that, although Torres pleaded guilty to the crimes against V. and G., for purposes of section 352 his conduct was "pretty remote in time" and "at least one of the victims [was] going to testify that there was penetration involved," which would be "extremely prejudicial," especially in a case like this which involved no penetration, only touching beneath the victim's clothing on her legs and stomach.

The prosecutor opposed Torres's in limine motion, arguing that the evidence of Torres's prior offenses was admissible:

> "Your Honor, [there are] multiple reasons why we believe that those prior incidents should come in, both under section 1101 and 1108.
>
> "[Section] 1108 allows us to argue propensity. And I think it's pretty established why that evidence is extremely probative[.] [W]ith respect to the [section] 1101 aspect of it, [Torres], through his prior acts—it will help the jury understand his intent when it comes to some relatively minor touching on the scale of [Penal Code section] 288's.
>
> "It also demonstrates a motive and then, also, an opportunity to commit the crimes. All three of these girls [(V., G., and the

22

victim)]—two of them now women—were stepdaughters of [Torres], who lived inside his home.

"Most of these acts occurred in the early morning hours, when [Torres] would get up . . . to go to work.  And so I think there are sufficient similarities between the two of them to allow the introduction [of the evidence] not only under [section] 1108 but, also, under [section] 1101.

"There may also be an argument by [Torres] that, because our current victim had roommates, that these were all imagined events, when, clearly, in the prior case, these two prior victim stepdaughters were roommates when a lot of molests occurred.  And, in fact, . . . one of them saw the abuse happen to the other victim.

"So, for all of those reasons, that evidence is extremely probative and outweighs any undue prejudice."

a. *Court's ruling*

The court denied Torres's motion to exclude the evidence of his admitted

uncharged prior crimes against V. and G., stating:

"After weighing and balancing under [section] 352, I am finding that the probative value outweighs any unduly prejudicial effect, given the reasons and arguments as set forth in the papers and responses to the in limine motions.

"And I have given this issue a lot of thought over the lunch hour.  It seems to me that it's a critical issue . . . in all of the motions that were filed.

"I think, under the [section] 1108 analysis, it's clearly relevant, as well as under the [section] 1101 analysis.  And I have weighed, under . . . section 352 . . . as required.

"And I find the arguments that are set forth in the People's papers are persuasive."

23

2. *The propensity evidence (§ 1108) of Torres's prior lewd acts*

a. *Stipulations*

As previously noted, the parties stipulated at trial that Torres was charged in February 2002 under Penal Code section 288(a) with 26 counts of committing lewd and lascivious acts on a child under the age of 14 years between 1989 and 1999. Those offenses involved Torres's two stepdaughters, V. and G. The parties also stipulated that Torres pleaded guilty in May 2002 to committing three of those counts against V. and the other three counts against G. and that the remaining charges were dismissed.

V., G., and retired San Diego Police Department Detective James McGhee all testified about Torres's prior sexual offenses against V. and G.

b. *V.'s and G.'s testimony*

V. was 30 years of age when she testified in this case. She testified that her mother started dating Torres when V. was five or six years old. G. is one year younger than V. The two sisters shared a room and slept in bunk beds. V. and G.'s mother worked very early in the morning and left for work by about 4:00 a.m. Torres left at around 7:00 a.m.

She testified that when she was six years old Torres came into her bedroom early one morning after her mother went to work. He picked V. up, carried her to her mother's room, and caressed her legs and thighs. V. testified that, when she fully awoke, Torres "let [her] go" and she went back to her bedroom. She did not tell anyone about the touching. The touching continued about two times each week, sometimes in V.'s mother's room and sometimes in V. and G.'s room. V. testified she did not tell anyone

24

because Torres threatened to hurt her mother if she told anyone. He threatened her more than one time. V. testified that Torres's threat scared her. He then started to touch her more often.

V. also testified that Torres *started molesting her when she turned seven*. He undressed V., her mother was at night school learning English, Torres had sent V.'s siblings to the store, and V. had stayed with him. Torres took off her pants and underwear and rubbed her vagina with his fingers in the living room. Torres undressed himself and touched her genitalia with his own.

V. testified she has tried to forget what happened to her. She did not remember if it hurt when Torres touched her vagina, and she did not know whether he ejaculated.

V. also testified that Torres would enter her and G.'s bedroom, undress her, and rub his genitalia against hers *while G. was also in the bedroom*. He stopped molesting V. in around 1996 when she turned 13, shortly before she started menstruating.

G. was 29 years of age when she testified in this case. She testified that Torres *began touching her when she was around eight years old*. The first touching occurred in the middle of the night while she was sleeping in the bedroom she shared with her sister, V. She woke up and found Torres under the blankets, between her spread legs, touching and fondling her "privates" with his hands. Torres told G., who was very scared, to be quiet or he would "hurt [her] mom." Torres touched her for 20 or 30 minutes. V. was in the same bed, but she did not wake up.

G. also testified that, over the years, Torres repeatedly touched and fondled her breasts and "behind," and he would caress her legs and "just slowly move up higher and

25

higher." Sometimes he digitally penetrated G.'s genitals. The sexual molestation continued until G. turned 15. G. eventually told V.

V. testified that when she learned that Torres had also molested G. she told their mother. Their mother did not believe them. V. and G. then ran away and stayed at G.'s boyfriend's house. V., who was then 18 years of age, reported the abuse to the police about two weeks later after their mother called the police and accused her of taking G. away.

c. *Detective McGhee's testimony and the video recording of his interview of Torres*

Detective McGhee testified that he interviewed Torres in 2002 about the molestations of V. and G. A video recording of the interview was played for the jurors, who were given copies of the transcript of the interview.

During the interview Torres, after he was read his *Miranda*[3] rights and he waived those rights, admitted he started sexually molesting V. when she was about seven years old. He also admitted he put his penis in V.'s vagina when she was seven years old. He told the detective he did not use a condom, but he ejaculated outside of her.

Torres told Detective McGhee that "one of those times" he "didn't penetrate [V.] all the way" because he woke up, found V. in his bed, and mistook her for his wife. Detective McGhee asked him, "Well, how does a man not know it's his wife, but his seven year old daughter until he has his erect penis, and he's, practically, stickin' it in her vagina, then he realizes it's not his wife?" Torres replied, "I was half asleep."

---

3     *Miranda v. Arizona* (1966) 384 U.S. 436.

26

Torres then claimed the second incident happened when he went to wake up V. and G. and they asked him to lie next to them in their bed. He told the detective that he fell asleep. McGhee asked Torres, "[A]t some point, you had sex with her, right? Or, both of 'em?" Torres replied, "Yeah." Torres said he never put his penis inside G.'s vagina. Torres admitted he touched V. more than once a month.

Detective McGhee told Torres, "[V.] said . . . you raped her about 20, 25 times." Torres replied, "Raped her?" Detective McGhee said, "that's what she considered it," and then asked Torres, "What do you consider it? . . . [W]hat do you call a 27 year old man having intercourse with a [seven] year old girl?" Torres answered, "Yeah, I would say rape[.] I know that's what it looks like."

B. *Applicable Legal Principles*

1. *Sections 1108 and 352*

As a general rule, evidence of a person's character is inadmissible to prove conduct on a specific occasion. (§ 1101, subd. (a) (hereafter § 1101(a); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393.) Thus, evidence of other crimes or bad acts is generally inadmissible when it is offered to show a defendant had the criminal disposition or propensity to commit the crime charged. (*Ibid*.)

However, an exception to this rule is set forth in section 1108, which provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a), hereafter (§ 1108(a); *People v. Nguyen* (2010) 184 Cal.App.4th

27

1096, 1115-1116.)  In *Falsetta*, *supra*, 21 Cal.4th 903, the California Supreme Court explained the legislative purpose of section 1108:

> "[T]he Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases. . . . [¶] Available legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101[(a)] imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility."  (*Falsetta*, at p. 911.)

Section 1108 allows admission, in a criminal action in which the defendant is accused of one of a list of sexual offenses, of evidence of the defendant's commission of another listed sexual offense that otherwise would be made inadmissible by section 1101(a).  (See § 1108, subds. (a), (d)(1).)  Furthermore, the uncharged and charged offenses are considered sufficiently similar if they are both sexual offenses enumerated in section 1108.  (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41.)

Accordingly, here, evidence that Torres committed a prior lewd or lascivious act upon a child under the age of 14 years in violation of Penal Code section 288—one of the enumerated sexual offenses listed in subdivision (d)(1)(A) of section 1108—was admissible to prove he had a propensity to commit the relevant charged and listed offenses of which he ultimately was convicted in this case (counts 1-4: Pen. Code, § 288(a)) unless that evidence was inadmissible under section 352.  (§ 1108, subd. (a).)

As the Supreme Court stated in *Falsetta*, *supra*, 21 Cal.4th 903, in determining whether to admit section 1108 propensity evidence of a defendant's prior sexual offense, trial courts "must engage in a careful weighing process under section 352" by "consider[ing]" various "factors" (hereafter referred to as the *Falsetta* factors),

28

"such . . . as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, at p. 917.) The *Falsetta* court held that section 1108 does not violate due process principles, and, thus, is constitutionally valid, because it subjects evidence of uncharged sexual misconduct to the weighing process of section 352 in sex crime prosecutions. (*Falsetta*, *supra*, at pp. 907, 917-918, 922.)

Under section 352, which is referenced in section 1108, evidence is properly excluded if its probative value is "substantially outweighed" by the probability that its admission will necessitate undue consumption of time, or create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (§ 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) A decision to exclude evidence under section 352 comes within the trial court's broad discretionary powers and "will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

The prejudice that exclusion of evidence under section 352 is designed to avoid "is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The

29

"prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) " 'In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 286.)

2. *Standard of review*

On appeal, we review the trial court's admission of section 1108 evidence, including its section 352 weighing process, for abuse of discretion. (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1104-1105; *People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097.) "We will not find that a court abuses its discretion in admitting such other sexual acts evidence unless its ruling ' "falls outside the bounds of reason." ' " (*People v. Dejourney*, at p. 1105.) Alternatively stated, we will not reverse a trial court's exercise of discretion under sections 1108 and 352 unless its decision was arbitrary, capricious or patently absurd and resulted in a manifest miscarriage of justice. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286; *People v. Nguyen*, *supra*, 184 Cal.App.4th at p. 1116.)

C. *Analysis*

Torres has failed to meet his burden of showing the court abused its discretion or violated his right to a fair trial by admitting, under sections 1108 and 352, the evidence that he previously had committed and been convicted of lewd acts upon his stepdaughters

30

V. and G., who were then children under the age of 14 years. We first conclude that Torres has failed to show the court's decision to admit this highly relevant propensity evidence was arbitrary, capricious or patently absurd. (See *People v. Lewis*, *supra*, 46 Cal.4th at p. 1286.) In his in limine motion Torres had urged the court, after considering the *Falsetta* factors (see *Falsetta*, *supra*, 21 Cal.4th at p. 917), to exclude this evidence as unduly prejudicial within the meaning of section 352. In announcing its determination that the evidence was admissible, the court explained it had given this "critical" issue "a lot of thought" and had "weigh[ed] and balanc[ed]" the probative value of this evidence against its prejudicial effect as it was required to do under section 352. In denying Torres's in limine motion, the court found that "the probative value outweigh[ed] any unduly prejudicial effect."

The court did not abuse its discretion in making this determination. For purposes of section 352 most of the *Falsetta* factors weigh in favor of the admissibility of the challenged propensity evidence the court admitted in this case. Specifically, regarding the nature and relevance of the prior sexual offenses (see *Falsetta*, *supra*, 21 Cal.4th at p. 917), the challenged evidence here of Torres's prior offenses is highly probative on the issue of whether he is sexually attracted to young children and would have had an interest in engaging in sexual acts with the victim, who testified that Torres began molesting her when she was seven or eight years old. The victim was 12 years old when she testified at trial in this matter.

The evidence is also highly probative with respect to the critical issue of the credibility of not only the victim, but also of Torres, whose defense was that he did not

31

sexually molest her. As noted, the legislative history of section 1108 indicates that section 1108 was intended in sex offense cases to relax the evidentiary restraints of section 1101(a) "to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*Falsetta*, *supra*, 21 Cal.4th at p. 911.) Here, a principal theory of the defense at trial was that the victim lied about the sexual molestations Torres was accused of committing. Torres presented several witnesses who testified that the victim had a reputation for being dishonest. On appeal, Torres particularly complains about the admission of detailed propensity evidence that he asserts was "highly irrelevant and inflammatory." As Torres raised the critical evidentiary issue of whether the victim dishonestly and falsely accused him of molesting her from the time she was seven or eight years old, detailed propensity evidence showing that Torres began sexually molesting his other stepdaughters, V. and G., at similar ages was highly probative with respect to the issue of his and the victim's credibility and was admissible despite any prejudicial effect that necessarily resulted from the admission of such evidence. As already discussed, the prejudice that exclusion of evidence under section 352 is designed to avoid "is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[All] evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." ' " (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.)

Another *Falsetta* factor is the degree of certainty the defendant committed the uncharged prior sexual offenses. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Here, there is no

uncertainty as to whether Torres committed the uncharged sexual offenses against V. and G. He stipulated at trial that he pleaded guilty in May 2002 to committing three of those six offenses against V. and the other three against G.

Another *Falsetta* factor is the likelihood of confusing, misleading, or distracting the jurors from their main inquiry. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Here, particularly in light of the undisputed fact that he admitted he committed the prior sexual offenses, Torres has not shown, and cannot demonstrate, a likelihood that the admission of the section 1108 evidence misled, confused, or distracted the jurors from their main inquiry into whether he was guilty or innocent of the current charged offenses. Although the prosecutor had estimated that the presentation of the propensity evidence would take "about a day," the record shows that it took a little over an hour to present V.'s and G.'s testimony and play the video recording of Torres's 2002 police interview. Specifically, V. and G. each testified for only about 18 minutes, and the playing of the video recording for the jury took about 30 minutes.

Another *Falsetta* factor is the similarity of the uncharged prior sexual offenses to the current charged offenses. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Here, the detailed propensity evidence admitted under section 1108 shows the uncharged prior sexual offenses and the current charged offenses are very similar in that all three victims (V., G., and the current victim) were Torres's stepdaughters who lived in his home, the sexual touching always happened early in the early morning hours before Torres left for work, the touchings would sometimes happen even if a sibling of the victim was present in the

33

same room, and the testimony of the victims shows Torres began molesting them at around the same young age of seven or eight years.

We note that the detailed propensity evidence was particularly probative because, as the Attorney General correctly points out, it tended to dispel the defense theory that it would have been impossible for Torres to molest the victim without being seen by siblings sleeping in the same bedroom. For example, the victim's sister, K.C., testified that she and the victim slept in twin beds that were pushed together in the bedroom they shared in the Lakeside house and the victim always slept by the wall, so that someone would have to climb over K.C. to get next to the victim. K.C. also testified she never woke up in the middle of the night and noticed Torres climbing over her to get to the victim. During closing arguments, defense counsel essentially argued it was impossible for Torres to molest the victim while she slept against the wall on the other side of her sister K.C. Defense counsel also argued that K.C. and C.C., Jr. "were in the room [with the victim] every single time. [¶] So how did it happen?" The detailed propensity evidence was highly probative because it showed that Torres's first two stepdaughters always slept together in the same room and Torres repeatedly molested them while they slept in the same room.

Another *Falsetta* factor is the "possible remoteness" of uncharged prior sexual offenses. (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) Here, as noted, Torres was convicted of the prior sex offenses in 2002. During the hearing on Torres's motion in limine to exclude the propensity evidence, defense counsel argued the evidence of the prior sexual offenses should be excluded because, "if we look at when the conduct occurred in this

34

case, in the [19]90's, I think that it's pretty remote in time." Here, the victim testified Torres began molesting her when she was seven or eight years old—around 2007 or 2008. However, the passage of the years between Torres's admitted commission of his sexual offenses against V. and G. and his commission of the charged current offenses does not militate against admission of the propensity evidence. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284.) The "significant similarities between the prior and the charged offenses" make the remoteness factor less important. (See *id*. at p. 285; see also *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [uncharged sexual offenses involving the same victim occurring between 15 and 22 years before trial not found too remote, in part because the similarities in the prior and current acts "balanced out the remoteness"].)

It is true, as Torres points out, that the challenged propensity evidence shows his prior crimes against V. involved repeated rape, whereas the current charged offenses did not involve any penetration. The record shows that when the victim was asked at trial whether Torres touched her vaginal area, she answered, "Somewhat," but she did not testify to any actual penetration. However, because the details of Torres's prior sexual offenses against his first two stepdaughters were highly probative on the critical issue of the victim's credibility as the accusing witness, which Torres's trial counsel so vigorously attacked, we conclude the court properly found "the probative value [of the propensity] evidence outweigh[ed]" its prejudicial effect.

35

For all of the foregoing reasons, we conclude the court did not abuse its discretion in admitting the section 1108 evidence of the uncharged sexual offenses against V. and G.

## II. *RELATED CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL*

In a related claim Torres contends that, "if this Court determines that the trial court did not abuse its discretion by admitting the prior-sex-offense evidence without limitation," his convictions should be reversed and the matter remanded for retrial because his trial counsel provided ineffective assistance by failing to make "fact-specific objections" to exclude "irrelevant and highly inflammatory details" of his prior sexual molestations of V. and G. We reject this contention.

### A. *Applicable Legal Principles*

The law governing Torres's claim of ineffective assistance of counsel is settled. A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Frye* (1998) 18 Cal.4th 894, 979 (*Frye*).) To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687-688, 691-692; *Frye*, at p. 979.)

To demonstrate prejudice, a defendant asserting an ineffective assistance claim on appeal must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466

36

U.S. at pp. 693-694; *Frye*, 18 Cal.4th at p. 979.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

*Strickland* explained that "[j]udicial scrutiny of counsel's performance must be *highly deferential* [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland*, *supra*, 466 U.S. at p. 689, italics added.) *Strickland* also explained that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Ibid.*)

The California Supreme Court has explained that " '[w]hen a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) "A reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*Ibid.*)

B. *Analysis*

Applying a highly deferential standard of scrutiny and indulging a strong presumption that the conduct of Torres's trial counsel fell within the wide range of reasonable professional assistance, as we must (*Strickland*, *supra*, 466 U.S. at p. 689), we reject Torres ineffective assistance of counsel claim because his trial counsel's tactics with respect to the question of the admissibility of the detailed section 1108 propensity

37

evidence (discussed, *ante*) of Torres's prior sexual offenses were reasonable tactical decisions that this court will not second-guess. (See *People v. Kelly*, *supra*, 1 Cal.4th at p. 520.)

Torres complains that, "[a]t the in limine hearing, defense counsel should have specifically requested that the prior-sex-offense evidence be redacted or sanitized to exclude irrelevant and highly inflammatory details." He also complains that his trial counsel "should have objected to particular points in [V.'s] and [G.'s] testimony under . . . section 352, and requested that any testimony given be stricken." He further asserts that his counsel "should have asked to redact highly inflammatory portions of the video recording of [his] 2002 interrogation, especially [his] admissions to raping seven-year-old [V.] and [Detective McGhee's] prejudicial comments." We have set forth, *ante*, all of the challenged evidence that Torres asserts was "irrelevant and highly inflammatory."

Torres's assertions are unavailing because the record shows his trial counsel made reasonable and concerted efforts to exclude the challenged evidence. We have already discussed defense counsel vigorous efforts to persuade the court during the in limine proceedings to exclude the evidence of Torres's prior sexual offenses against V. and G., including the specific evidence at issue here. Torres discussed all of the *Falsetta* factors (see *Falsetta*, *supra*, 21 Cal.4th at p. 917) in his unsuccessful motion in limine to exclude under section 352 the evidence of his prior sexual offenses.

Defense counsel made additional efforts to exclude this evidence and was successful in persuading the court to exclude some of it. After V. testified, and just

38

before the prosecution called G. as a witness, defense counsel renewed his objections under section 352 to the admission of Detective McGhee's recorded 2002 interview of Torres containing Torres's admissions regarding his sexual offenses against V. and G. Specifically, defense counsel argued the evidence was not relevant and "[it was] more prejudicial than . . . probative" for purposes of section 352. He also argued that "these [Penal Code section] 1108 witnesses [(V. and G.) were] testifying," and he asserted that "this taped interview becomes less and less relevant" because of "the fact that we have entered a stipulation that [Torres] did plead guilty to these charges."

The court found that Torres's intent was "an issue in the new case," and the information in the recorded interview was relevant to the issue of Torres's intent. Under its section 352 "weighing and balancing" analysis, the court found that "most of this [evidence] is admissible" because "the probative value outweighs any overly prejudicial effect." However, demonstrating it was familiar with the contents of the transcript, the court found that the last paragraph on page 18 and all of pages 19 and 20 were "not relevant to anything" and ordered these portions of the transcript redacted. The court directed the prosecutor to "redact the tape" and instructed him to only "play [the recording] up to that point."

In light of these reasonable efforts by defense counsel to exclude what Torres refers to as "irrelevant and highly inflammatory" evidence of his sexual molestations of V. and G., we conclude Torres has failed to meet his burden of demonstrating his trial counsel's performance was constitutionally deficient.

### III. *INEFFECTIVE ASSISTANCE OF COUNSEL* (*FAILURE TO MOVE FOR A MISTRIAL*)

Torres next contends his convictions should be reversed and the matter remanded for retrial because his trial counsel provided ineffective assistance—after the panel of prospective jurors was informed of Torres's prior sexual offenses—by failing to move for a mistrial after prospective juror No. 90, a neuroscientist who stated she had had expertise in "fear, rage, and attraction," allegedly "tainted the entire jury venire with bias" by stating that she would probably add bias to the jury because people are "likely to repeat their behavior." We reject this contention.

A. *Background*

During the voir dire, the court advised the jury venire that Torres was charged with four counts of committing a lewd and lascivious upon the victim, a child under 14 years of age. The court thereafter advised the prospective jurors that Torres previously had been convicted of the same offense. Several potential jurors indicated they could not be fair.

On the second day of jury selection, defense counsel asked the jury venire whether there was "anything about this case that you tell yourself, 'I can't do it[']?" Prospective juror No. 90 responded:

> "Yeah. I'm a neuroscientist, and I . . . specialize in fear, rage and attraction. So *I have special expertise*.
>
> "And . . . I come in with bias, and *I have special expertise*. And I would probably add bias to the jury. I'm a very strong person. And I think I would be able to—" (Italics added.)

Defense counsel interjected, stating: "When you say you would 'add bias—' "

Prospective juror No. 90 responded:

> "From my professional expertise as well as the experiences that I
> mentioned yesterday, personal experiences with the issue.
>
> "So, from that, I mean, my professional expertise allows me to add
> extra weight to why, you know, someone was previously—they are
> not like a coin. *They're likely to repeat their behavior.*" (Italics
> added.)

Shortly thereafter the prosecutor and defense counsel jointly moved to dismiss prospective juror No. 90 for cause, and the court granted the motion. It is undisputed that defense counsel did not move for a mistrial based on prospective juror No. 90's remarks.

B. *Analysis*

Torres has failed to meet his burden of demonstrating his counsel's performance was deficient. In support of his claim that his trial counsel provided constitutionally ineffective assistance by failing to move for a mistrial based on prospective juror No. 90's statements, Torres asserts those statements "infected the entire panel with bias, violating [his] Sixth Amendment right to an impartial jury." Specifically, he asserts the statements "tainted" the entire panel because prospective juror No. 90, whom the court ultimately struck for cause from the panel of prospective jurors, "repeatedly referred to herself as having 'expertise' " and "told the panel that sex offenders 'are not like [the flip of] a coin,' because they are 'likely to repeat their behavior.' " Relying on *People v. McFarland* (2000) 78 Cal.App.4th 489 (*McFarland*) for the proposition that "*expert testimony regarding recidivism and sexual propensity is highly prejudicial*" (italics added), Torres asserts that, "[u]nder *McFarland*, Prospective Juror [No. 90's] *expert statement* was

41

highly prejudicial, and therefore infected the entire jury venire with bias." (Italics added.)

These assertions and Torres's reliance on *McFarland* are unavailing. Nothing in the record supports his assertion, which is speculative at best, that prospective juror No. 90's statements during voir dire "infected the entire panel with bias."

Torres's reliance on *McFarland* is misplaced. "[C]ases are not authority for propositions not considered." (*People v. Brown* (2012) 54 Cal.4th 314, 330.) Contrary to Torres's suggestion, *McFarland* did not consider the issue of whether a prospective juror who refers to his or her professional expertise in explaining to the court during voir dire why he or she is biased thereby "infect[s] the entire panel with bias" such that the defendant's trial counsel has a professional obligation to move for a mistrial. In *McFarland* the defendant was charged with annoying or molesting a child under Penal Code section 647.6, which required proof that his conduct was motivated by an unnatural or abnormal sexual interest in the victim. (*McFarland*, *supra*, 78 Cal.App.4th at p. 494.) The trial court allowed the prosecution, over a defense objection, to present under section 1108(a) the expert *testimony* of a forensic psychiatrist who gave his opinion on the ultimate issue in the case by testifying the defendant was motivated by an unnatural or abnormal sexual interest in the child victim when he touched her. (*McFarland*, at pp. 492, 494-495.) The Court of Appeal in *McFarland* held that section 1108(a) does not authorize a psychiatrist called as an expert witness to render an opinion about the defendant's sexual propensity during the prosecution's case-in-chief. (*McFarland*, at pp. 491, 493.) *McFarland* is inapposite. Here, unlike the psychiatrist in *McFarland*,

42

prospective juror No. 90 was not an expert witnesses who testified about the defendant's sexual propensity during the prosecution's case-in-chief.

Torres also relies on the Ninth's Circuit's decision in *Mach v. Stewart* (9th Cir. 1997) 137 F.3d 630. His reliance on that case is also misplaced. In *Mach* the defendant was charged with sexual conduct with a minor under 14 years of age. (*Id*. at p. 631.) During voir dire, the trial court elicited from a prospective juror (1) that she had expertise in this area in that she had taken child psychology courses, had worked with psychologists and psychiatrists, and had worked with children as a social worker for at least three years; and (2) four separate statements that she had never been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out. (*Id*. at pp. 632-633.) The court then went on to elicit yet another statement from the social worker that she had never known a child to lie about sexual abuse. (*Id*. at p. 633.) Defense counsel brought a motion for mistrial, arguing the entire panel had been tainted by the exchange between the court and the social worker venireperson. (*Id*. at p. 632.) The trial court denied the mistrial motion but excused the social worker for cause. (*Ibid*.) On appeal from the denial of the defendant's habeas corpus petition in federal district court, the *Mach* court reversed the defendant's conviction, stating, "[W]e presume that at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused." (*Id*. at pp. 632-633.)

Torres's reliance on *Mach* is unavailing because the instant case is factually distinguishable in that prospective juror No. 90—unlike the social worker venireperson in

43

*Mach*—did not make repeated statements that children simply never lie about being sexually abused. As already noted, prospective juror No. 90 merely stated that, based on her expertise and experience, she "would probably add bias to the jury" because people are "likely to repeat their behavior." Even if *Mach* were not distinguishable, Ninth Circuit authority is not binding on this court. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1292.)

Torres's experienced trial counsel was able to properly assess the ability of the venirepersons to serve as impartial jurors, and we will not second-guess his reasonable decision that there was no basis to bring a mistrial motion based on prospective juror No. 90's very brief and nontestimonial comments about her personal bias during the jury selection process. (See *People v. Kelly*, *supra*, 1 Cal.4th at p. 520 [reviewing courts "will not second-guess trial counsel's reasonable tactical decisions."].) In sum, we reject Torres's ineffective-assistance-of-counsel claim.

IV. *COURT'S RESPONSE TO JUROR NOTE NO. 3 (FIRST QUESTION)*

Torres also claims that two of his four convictions—either counts 2 and 4 (the "last-time" counts) or (as the Attorney General suggests) counts 1 and 3 (the "first-time" counts)—should be reversed because the court lowered the prosecution's burden of proof and violated his federal Constitutional right to due process when it erroneously responded to the first of two questions in jury note No. 3 by answering "Yes" to the question of whether, if the jury were to agree that "one instance" happened, "[that would] also be both a 'first time' and 'last time.'" As noted, the Attorney General concedes that two of

44

Torres's four convictions—specifically, counts 1 and 3—should be reversed. We conclude Torres's convictions of counts 1 and 3 must be reversed.

A. *Background*

1. *Counts 1 and 3* (*the first-time counts*) *and counts 2 and 4* (*the last-time counts*)

As discussed, *ante*, Torres was charged in this case with four counts of committing a lewd and lascivious act upon the victim, a child under the age of 14 years, in violation of Penal Code section 288(a)), and the information alleged he committed each offense between January 1, 2011 and October 16, 2012. Specifically, in counts 1 and 2 the information alleged that he touched the victim's *legs* two times during that time period: a "first time" (count 1) and a "last time" (count 2). In counts 3 and 4 the information alleged that Torres touched the victim's *stomach* two times during that period: a "first time" (count 3) and a "last time" (count 4). Thus, counts 1 and 3 were the "first-time" counts, and counts 2 and 4 were the "last-time" counts.

2. *The two questions in jury note No. 3 and the court's responses*

During deliberations the jury submitted jury note No. 3, which contained two questions seeking clarification on points of law:

> "[Question No. 1:] The charges refer to a 'first time' and 'last time.' *If the jury were to agree that one instance happened, wouldn't that also be a 'first time' and 'last time'*?" (Italics added.)

> "[Question No. 2:] Defendant is charged with offenses [o]ccurring at Craigie Street, Jan. 1, 2011 through Oct. 16, 2012. *Does that [m]ean we are not to consider [e]vents that may or may not have [o]ccurred at the Lakeside and Home Avenue addresses*?" (Italics added.)

45

The trial court and counsel discussed the questions and possible responses. Specifically, when the court received jury note No. 3 it asked for defense counsel's position. Defense counsel replied that the jury "can't just pick an act and say that was both the first time and last time because they're two separate charges. I just don't know how to respond to that question" The prosecutor suggested that the court instruct the jury that "if the jury finds that only one of those acts occurred, it cannot be both the first and last one." Defense counsel responded, "I just don't see how we can [answer the jury's question]."

Implicitly alluding to the date ranges alleged in the information, the court asked, "[T]he allegation is—the theory of the People's case is that the last time it took place was at the Craigie Street address[,] correct?" The prosecutor replied, "[Y]es." Agreeing with the prosecutor, defense counsel stated, "According to the dates [alleged in the information], the first time is also at the Craigie Street address."

In response the court stated, "Could be [the] Craigie Street address." Agreeing, the prosecutor stated, "Could be." The prosecutor, however, then stated, "It could be the *Home Avenue address*. It wasn't exactly established exactly when they moved to the Craigie Street address."[4] (Italics added.)

---

4    The trial evidence did establish when the family moved to the Craigie Street address. Mother testified she and her family lived in the Lakeside house for about one and a half years, and then they moved into an apartment on Home Avenue. She also testified they lived in that apartment for most of 2009. The prosecutor then asked mother, "So you moved into the Craigie Street house in 2010[,] is that right?" Mother replied, "Yes." As noted, the information alleged that Torres committed all four of the charged lewd acts between January 1, 2011 and October 16, 2012.

46

Following further discussion, the court told counsel that "the last time . . . clearly ha[d] to be [at the] Craigie [Street address]."  The court then read out loud the first question contained in jury note No. 3:  " 'If the jury were to agree that *one instance* happened, wouldn't that also be both the "first time" and "last time?" ' "

After reading the question, and addressing both the first and second questions contained in jury note No. 3, the court stated, "The direct answer is 'yes,' but the allegation of 'last time' refers to events . . . that took place at Craigie Street."  The prosecutor agreed, stating, "Yes.  Yes.  Or at least during the date range that we've alleged."  Defense counsel responded, "I don't see how we can really answer this question."

Following further discussion, defense counsel—addressing the jury's second question in jury note No. 3 (whether "[they were] not to consider [e]vents that may or may not have [o]ccurred at the Lakeside and Home Avenue addresses?")—indicated the court should tell the jurors they should consider all of the evidence, including the evidence of events that may have occurred at the Lakeside and Home Avenue addresses:

> "We can't just tell [the jurors] they can't consider . . . the testimony from Lakeside or the testimony from Home Avenue and just focus on what happened at Craigie Street.  Because *they need to consider everything*."  (Italics added.)

Agreeing with Torres's counsel, the prosecutor—also addressing the jury's second question in jury note No. 3—said, "I think the reply [to jury note No. 3] should be, 'You may consider *all of the evidence that was admitted at trial*.' "  (Italics added.)

a. *The court's rulings and responses to the two questions in jury note No. 3*

The court then issued its ruling on the response it would give to the *first* question contained in jury note No. 3.  The court stated:

> "So the answer then for [question] number 1 will be 'yes.'
>
> "And then, 'counts 2 and 4 refer to events alleged to have occurred at the Craigie Street address.' "

Immediately thereafter the court issued its ruling on the response it would give to the *second* question contained in jury note No. 3.  The court stated its response would be, "You may consider all the evidence that was admitted at trial."

The trial court thereafter sent to the jury its typed response to jury note No. 3, which stated:

> "1.  Yes.  Counts 2 and 4 refer to [e]vents alleged to have occurred at the Craigie Street address.
>
> "2.  You may consider all the [e]vidence that was admitted at trial."

B.  *Analysis*

As noted, Torres claims two of his four convictions—either counts 2 and 4 or counts 1 and 3—should be reversed because the court lowered the prosecution's burden of proof and violated his federal Constitutional right to due process by erroneously responding to the *first* of the two questions set forth in jury note No. 3 by answering "Yes" to that question, which asked:  "If the jury were to agree that one instance happened, wouldn't that also be a 'first time' and 'last time?' "  Torres asserts the court, in responding to that question, should have instructed the jury as follows:

48

"As used in the charges against Mr. Torres, 'first time' and 'last time' refer to two separate acts. One act cannot be both a 'first time' and a 'last time.' "

Torres also asserts the court's response instructed the jury "that if the jurors agreed that one leg-touching or one stomach-touching act occurred, the single act would be both a 'first time' and 'last time.' " He argues that "[t]he instruction is erroneous on its face because it lower[ed] the prosecution's burden of proof by allowing the jury to return guilty verdicts on four counts if it unanimously found that only two offenses occurred." Torres also argues the court violated his Sixth Amendment right to a jury trial by directing verdicts on two counts.

The Attorney General concedes that two of Torres's four convictions—specifically, counts 1 and 3—should be reversed because "the trial court's response could have led the jurors to find [Torres] guilty of four counts even if the jurors only agreed that he was guilty of two criminal acts."

The parties are correct that two of Torres's four convictions of committing a lewd and lascivious act upon the victim must be reversed because the court's response to the first question contained in jury note No. 3, lowered the prosecution's burden of proof and violated Torres's Sixth Amendment right to a jury trial by directing verdicts on two counts. We conclude that Torres's convictions of counts 1 and 3 (the "first-time" counts), rather than counts 2 and 4 (the "last-time" counts), are the two counts that must be reversed. The first question contained in jury note No. 3 suggests the jury found that "one instance happened," which would involve both a leg-touching and a stomach-

49

touching.[5]  During Fortin's second recorded forensic interview of the victim in late October 2012 (discussed, *ante*), the victim said the last time Torres touched her was about two weeks earlier.  It is undisputed that Torres and the victim were then living at the Craigie Street address.  As already noted, the court instructed the jury in its response to jury note No. 3 that "[c]ounts 2 and 4 refer to events alleged to have occurred at the Craigie Street address," where the record shows the victim, her family, and Torres had been living since 2010.  The information alleged that Torres committed each of the four charged offense between January 1, 2011 and October 16, 2012.  Thus, the molestations charged in count 2 (the "last-time" leg-touching count) and count 4 (the "last-time" stomach-touching count) would have occurred while the victim and Torres were living at the Craigie Street address during the time period alleged in the information, and could not have happened while they were living at either the Lakeside house or the Home Avenue apartment.  As we shall explain, *post*, the two remaining counts—count 1 (the "first-time" leg-touching count) and count 3 (the "first-time" stomach-touching count) must be reversed for the additional reason that the court, in responding to the second question in jury note No. 3, erroneously instructed the jury that it could consider the evidence of Torres's conduct at the Lakeside house or the Home Avenue apartment.  That conduct necessarily happened *before* the family moved to the Craigie Street address in 2010, and before the time period charged in the information (between January 1, 2011 and October 16, 2012).

---

5      The first question in jury note No. 3 stated in part:  "*If the jury were to agree that one instance happened*, wouldn't that also be a 'first time' and 'last time'?"  (Italics added.)

50

### V. *CLAIM OF UNCONSTITUTIONAL INSTRUCTIONAL ERROR* (*COURT'S RESPONSE TO SECOND QUESTION IN JUROR NOTE NO. 3*)

In a related claim Torres contends all four of his convictions should be reversed and the case remanded for retrial because the court erroneously instructed the jury in its response to the second question in jury note No. 3 (discussed, *post*) that the jurors could consider "all the evidence," which (the record shows) included evidence of alleged acts that occurred *before* the time period charged in the information ("[o]n or about and between January 1, 2011 and October 16, 2012"). Thus, he asserts, the court violated his federal Constitutional right to due process under *Jackson v. Virginia* (1979) 443 U.S. 307 (*Jackson*) and *People v. Ngo* (2014) 225 Cal.App.4th 126 (*Ngo*) "by allowing the jury to convict [him] based on uncharged conduct."

Torres also contends the court's constitutional error requires reversal under either (1) *Boyde v. California* (1990) 494 U.S. 370 (*Boyde*) [" 'when a case is submitted to the jury on alternative theories[,] the unconstitutionality of any of the theories requires that the conviction be set aside"], because the court instructed the jury that its verdicts on all four counts could be based on either charged conduct, or on uncharged conduct that occurred before the charged time period (January 1, 2011 to October 16, 2012); or (2) *Neder v. U.S.* (1999) 527 U.S. 1, 15 (*Neder*)—which adopted the harmless error standard announced in *Chapman v. California* (1967) 386 U.S. 18[6] for instructional errors that

---

6    Under the *Chapman* harmless error standard, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681; see *Chapman v. California*, *supra*, 386 U.S. 18, 24.)

omit an element of an offense—because (Torres asserts) the Attorney General "cannot prove beyond a reasonable doubt that the jury did not base their verdicts on Counts 1 through 4 on uncharged conduct."

In response, the Attorney General acknowledges the court committed constitutional error with respect to counts 1 and 3 (the "first-time" counts) and asserts that Torres's convictions of those counts should be reversed "due to the trial court's flawed response" to jury note No. 3, but argues Torres's convictions of counts 2 and 4 (the "last-time" counts) should be affirmed because the court "properly instructed the jury on the date range of [those] charged offenses" and "there is no possibility that the jury could have convicted [Torres] on [those two] counts based upon anything that happened" before the time period charged in the information.

For reasons we shall explain, we reverse Torres's convictions of counts 1 and 3 and affirm his convictions of counts 2 and 4.

A. *Background*

As discussed, *ante*, the record shows the victim, her family, and Torres moved to the Craigie Street address in 2010. During Fortin's second recorded forensic interview of the victim in late October 2012, the victim said the last time Torres touched her was about two weeks earlier.

The second question contained in jury note No. 3 stated:

> "Defendant is charged with offenses [o]ccurring at Craigie Street, Jan. 1, 2011 through Oct. 16, 2012. *Does that [m]ean we are not to consider [e]vents that may or may not have [o]ccurred at the Lakeside and Home Avenue addresses*?" (Italics added.)

52

We already have discussed at length, *ante*, the court's discussions with both counsel regarding how the court should respond to the two questions contained in jury note No. 3. As pertinent here the court—alluding to the same date alleged in each of the four counts charged in the information—asked counsel, "[T]he allegation is—the theory of the People's case is that the last time it took place was at the Craigie Street address, correct?" The prosecutor replied, "[Y]es." Defense counsel agreed with the prosecutor, and added:

> "According to the dates [alleged in the information], the first time is also at the Craigie Street address."

Later during the discussion, however, defense counsel—while addressing the jury's second question in jury note No. 3 (whether "[they were] not to consider [e]vents that may or may not have [o]ccurred at the Lakeside and Home Avenue addresses?") — indicated the court should tell the jurors they should consider *all of the evidence*, including the evidence of events that may have occurred at the Lakeside and Home Avenue addresses before the family moved to the Craigie Street address in 2010:

> "We can't just tell [the jurors] they can't consider . . . the testimony from Lakeside or the testimony from Home Avenue and just focus on what happened at Craigie Street. Because *they need to consider everything*." (Italics added.)

The prosecutor agreed with Torres's attorney, stating, "I think the reply [to the second question in jury note No. 3] should be, 'You may consider *all of the evidence that was admitted at trial*.' " (Italics added.)

53

As pertinent here, the court responded to the second question in jury note No. 3 as follows:

"You may consider *all the evidence* that was admitted at trial."

As previously discussed, the court also instructed the jury in its response that "[c]ounts 2 and 4 refer to [e]vents alleged to have occurred [a]t the Craigie Street address."

B.  *Analysis*

Torres's claim of constitutional error is principally based on *Jackson*, *supra*, 443 U.S. 307 and *Ngo*, *supra*, 225 Cal.App.4th 126.  In *Jackson*, the United States Supreme Court explained that "[i]t is axiomatic that *a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process*."  (*Jackson*, at p. 314, italics added.)  In *Ngo*, the Court of Appeal held that a unanimity instruction that expanded the charged time period during which the defendant allegedly committed a charged lewd act on a child by force constituted error.[7]  (*Ngo*, at pp. 130, 148.)

Here, the Attorney General concedes that Torres's convictions of counts 1 and 3 (the "first-time" counts) should be reversed "due to the court's flawed response" to jury

---

[7]     The *Ngo* court explained that "[t]he second amended information charged defendant in Count Four with committing a lewd or lascivious act on a child by force 'On or about and between January 1, 2009, and December 31, 2009.'  However, in its unanimity instruction, the [trial] court instructed the jury that defendant was charged with committing that act 'sometime during the period of January 1, 2009 and December 31, 2010.'  Defendant argue[d] that by erroneously changing '2009' to '2010,' the court violated his federal rights to due process and trial by jury."  (*Ngo*, *supra*, 225 Cal.App.4th at p. 148.)  In *Ngo* the Attorney General conceded the unanimity instruction was erroneous.  (*Ibid*.)

note No. 3 that allowed the jury to consider "all the evidence," including evidence of Torres's alleged acts at the Lakeside and Home Avenue addresses *before* 2010 when the family moved to the Craigie Street address. We agree. The court's instruction violated Torres's federal constitutional right to due process because it permitted the jury to convict him of those counts based on uncharged conduct that occurred before the time period alleged in the information ("[o]n or about and between January 1, 2011 and October 16, 2012"). (*Jackson*, *supra*, 443 U.S. 307; *Ngo*, *supra*, 225 Cal.App.4th 126.) Accordingly, we need not decide which standard of prejudice applies and we reverse Torres's convictions of counts 1 and 3.

We reject Torres's contention that, for the same reason, counts 2 and 4 also must be reversed. The Attorney General asserts that Torres's convictions of counts 2 and 4 should be affirmed because the court "properly instructed the jury on the date range of [those] charged offenses" and "there is no possibility that the jury could have convicted [Torres] on [those two] [c]ounts based upon anything that happened" before the time period charged in the information. We agree. With respect to counts 2 and 4 the court gave a unanimity instruction that properly instructed the jurors with the dates alleged in the information. Specifically, the court gave the following modified instruction under CALCRIM No. 3501:

> "[Torres] is charged with lewd and lascivious act[s] on a child under 14 in Counts 1-4 *sometime during the period of January 1, 2011 to October 16, 2012*.
>
> "The People have presented evidence of more than one act to prove that [Torres] committed these offenses. You must not find [Torres] guilty unless:

55

"1. You all agree that the People have proved that [Torres] committed at least one of these acts and you all agree on which act he committed for each offense;
"OR

"2. You all agree that the People have proved that [Torres] committed all of the acts alleged to have occurred *during this time period* and have proved that [Torres] committed at least the number of offenses charged."

The court also specifically instructed that counts 2 and 4 "refer to events alleged to have occurred at the Craigie Street address." Absent any showing by Torres to the contrary, we presume the jurors understood and faithfully followed the court's instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

Furthermore, the evidence shows that the victim told both Officer Kuamoo and Detective Dickinson on October 16, 2012, that the last time Torres had touched her was about a week earlier; and that one week later, on October 23, the victim told Fortin during the second recorded forensic interview that the last time Torres touched her was about two weeks earlier. This strong evidence shows the "last-time" touchings (counts 2 and 4) happened at the Craigie Street address during the time period alleged in the accusatory pleading.

For the foregoing reasons we reverse Torres's convictions of counts 1 and 3 and affirm his convictions of counts 2 and 4.

## VI.  *RELATED ALTERNATIVE CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL*

Torres alternatively contends that, if this court determines that he has forfeited either of his two preceding claims of error—which are based on the trial court's responses

56

to jury note No. 3—by failing to state a proper objection, all four of his convictions should be reversed and the case remanded for retrial because "[h]e was denied his Sixth Amendment right to effective assistance of counsel when defense counsel failed to object to the trial court's instructions that (1) one act would be both a 'first time' and a 'last time,' and (2) the jury could consider acts that occurred outside the charged time period." We do not conclude that Torres forfeited these claims. Accordingly, we need not and do not reach Torres's claim of ineffective assistance of counsel.

## VII. *CUMULATIVE ERROR CLAIM*

Last, Torres contends all four of his convictions should be reversed and the case remanded for retrial because the "cumulative effect" of the court's "multiple errors" deprived him of his federal and state Constitutional due process right to a fair trial.

" '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) A defendant is "entitled to a fair trial but not a perfect one." (*Ibid.*)

"If none of the claimed errors were individual errors, they cannot constitute cumulative errors that somehow affected the . . . verdict." (*People v. Beeler* (1995) 9 Cal.4th 953, 994, abrogated on other grounds as recognized by *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

Here, with the exception of the court's flawed response to jury note No. 3, as to Torres's convictions of counts 2 and 4—which we are affirming—there were no errors that might rise by accretion to the level of reversible and prejudicial error.

57

DISPOSITION

The judgment is reversed in part and affirmed in part as modified. Torres's convictions of counts 1 and 3 are reversed. His convictions of counts 2 and 4 are affirmed. Torres's sentence is modified and reduced to an aggregate state prison term of 150 years to life plus 10 years, consisting of two consecutive indeterminate terms of 75 years to life (25 years to life under § 667.61, subd. (a), tripled under the Three Strikes law) for his convictions of counts 2 and 4, plus a consecutive determinate term of 10 years (five years on each count under § 667, subd. (a)(1)). The matter is remanded with directions that the superior court prepare an amended abstract of judgment to reflect these modifications to the judgment and to forward a certified copy of the corrected abstract to the Department of Corrections and Rehabilitation.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

McINTYRE, J.

58